Delio Alum Torres y Antonia Serrano, demandantes y recurridos, *v.* Rafael Campos del Toro y Rosaura Márquez, demandados y recurrentes.

*Número:* 12917　　　*Resuelto:* 23 de octubre de 1963

*Francisco M. Susoni* y *Pablo Defendini,* abogados de los recurrentes; *Antonio Reyes Delgado,* abogado de los recurridos.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señor Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Se trata de un recurso instado el 14 de mayo de 1958 contra una sentencia que declaró con lugar una demanda sobre reclamación del valor de bienes muebles y daños y

perjuicios. Fue presentado el alegato de los recurridos el 15 de abril de 1963.

El juicio en sus méritos se celebró durante los días 26, 27 y 28 de marzo de 1956 y 3, 4 y 5 de septiembre de 1957. Se practicó una extensa prueba testifical y documental. La transcripción de la evidencia oral excede de 600 páginas.

Hasta donde el tiempo de que disponemos nos lo ha permitido, hicimos una detenida revisión, análisis y estudio de las distintas piezas que forman el récord de revisión. Ello nos reveló la concurrencia de circunstancias, hechos y eventos en el caso que, afortunadamente, muy pocas veces se realizan dentro de los procesos judiciales ordinarios tramitados ante nuestros tribunales.

El juez sentenciador en sus precisas, claras y certeras determinaciones y conclusiones, expuso una Relación del Caso que, en lo pertinente, es como sigue:

"Los demandantes, después de sometido el caso, han presentado una moción para que se les permita enmendar el título de la acción y la súplica de la demanda. Los demandados no han objetado y nosotros entendemos que las alegaciones y las pruebas las justifican. *Muñoz* v. *Pardo* (1948), 68 D.P.R. 612 y *Fernández* v. *Sucn. Fernández* (1947), 66 D.P.R. 881. Por tanto, las admitimos y, de ahora en adelante, este pleito se denominará 'Cobro del Valor de Muebles Apropiados Ilegalmente . . .'; y, en vez de solicitar la reivindicación de los bienes, la acción se entiende dirigida a recobrar el valor de éstos, con el interés legal a partir de la fecha de la apropiación. 31 L.P.R.A. sec. 3518 y 32 L.P.R.A. sec. 1064; *Moskovitz* v. *LeFrancois*, Cal. (1932) 8 Pac. 2d 1050 y *Nelson* v. *Kunz* (Utah) 1938, 115 A.L.R. 1322.

"La demanda, tal como ha quedado después de las enmiendas, expone sólo dos reclamaciones; la primera por $23,645.67, alegado valor de los bienes ilegalmente apropiados, más el interés legal sobre esta suma, desde el día en que los demandados se incautaron de ellos, y la segunda por $15,000.00, por daños y perjuicios, ocasionados por un desahucio ilegal. Los hechos alegados para invocar estos remedios pueden asumirse de esta manera:

"La Primera Causa de Acción expresa que: (1) Don Rafael Campos del Toro y su esposa, Doña Rosaura Márquez, son dueños de un edificio de cinco plantas en Arecibo, del cual, por canon de $750.00 mensuales arrendaron tres pisos y medio a Don Delio Alum y su esposa Doña Antonia Serrano, quienes instalaron allí su vivienda, un salón de belleza y un hotel; (2) todos los muebles, el equipo y enseres de éstos, eran propiedad exclusiva de los demandantes; tenían un valor de $23,645.67 para el 17 de septiembre de 1952, y algunos estaban gravados a favor del Banco de Ponce por $2,788,92, otros a Don Ismael Hernández por $537,19, y otros a North Electric Co., por $368.00, créditos que fueron cedidos a los demandados; (3) para esta fecha, los demandantes debían $2,837.00 por cánones atrasados; los esposos Campos Márquez los demandaron para cobrarlos y les reclamaron, además $5,000.00, por daños al edificio; (4) previa fianza, la Sección de Arecibo del Tribunal Superior, ordenó el embargo de los muebles, equipo y enseres; el Alguacil los embargó cerrando los locales donde estaban y desalojó al demandante y a sus huéspedes; (5) Alum y su esposa no contestaron aquella demanda, se les anotó la rebeldía y se dictó sentencia en su contra por el importe de los cánones no pagados y $3,000.00 por daños; sin ser firme la sentencia se solicitó y ordenó su ejecución; la subasta se celebró cuando ya los demandados habían arrendado los muebles y los locales a un tercero, y ellos se adjudicaron los bienes; (6) los esposos Alum Serrano solicitaron la nulidad del embargo y de la venta judicial; el tribunal los declaró nulos; su resolución no fue apelada y, a pesar de ello, (7) los demandados no han devuelto los bienes embargados, han vendido algunos y otros han desaparecido.

"La Segunda Causa de Acción da por repetidos los hechos cuyo resumen antecede y alegan que: (1) a instancias de los demandados los demandantes fueron lanzados de los locales que ocupaban en el edificio de aquellos sin que contra ellos se hubiera dictado sentencia de desahucio, y (2) han sufrido daños físicos y morales por $15,000.00.

"La súplica es que se condene a los demandados a pagar $23,645.67 por los bienes muebles que se apropiaron más los intereses legales sobre la suma reclamada, desde el 17 de septiembre de 1952, y $15,000.00 por los daños y perjuicios que les causaron con el desahucio ilegal. En ella los demandantes aceptan que se les descuenten ciertos créditos, a que tienen derecho los

demandados, y solicitan $5,000.00 para costas, gastos y honorarios de abogado.

"La Contestación a la demanda enmendada y por las admisiones de los demandados, acepta muchos de los hechos comprendidos en el anterior resumen. Sin embargo, afirman (1) que en el momento del embargo los demandantes no ocupaban los locales arrendados y no eran dueños de los bienes que compraron a North Electric Co.; (2) convinieron por escrito que cualquier sentencia que se dictara contra ellos por cánones adeudados, a los treinta días, sería autoridad suficiente para desahuciarlos, y (3) que los demandados no poseen los bienes que se adjudicaron; que éstos no valían $23,645.67, y que los demandantes no han sufrido daños."

Sobre cada causa de acción especificó del modo que sigue los hechos que estimó probados:

*"Conclusiones de Hecho.—Primera Causa de Acción:*

"1. Los esposos don Rafael Campos y su esposa doña Rosaura Márquez son dueños de un edificio de cinco plantas en Arecibo, del cual, en diciembre de 1948, dieron a los demandantes en arrendamiento tres pisos y medio por canon de $750.00 mensuales, donde los esposos Alum-Serrano establecieron su vivienda, un salón de belleza y un hotel. De aquí en adelante nos referiremos a éstos como 'los locales'.

"2. Los muebles, el equipo y los enseres de éstos, incluyendo sus instalaciones eléctricas, botiquines y todas las dependencias, y una barra, una tarima y una balustrada en el salón de baile-comedor—que seguiremos llamando 'los muebles'—fueron comprados e instalados por los demandantes. Los accesorios eléctricos eran de tipo fijo en plafones y paredes, pero desmontables; los botiquines fueron incrustados en huecos de paredes, en forma que podían ser removidos sin detrimento del edificio, y las tres últimas quedaron adheridas al piso del salón.

"3. Los demandantes quedaron a deber parte del precio de compra de casi todos los muebles, y entre otros, quedaron gravados a favor de sus vendedores los comprados a don Ismael Hernández y a North Electric Co. Además, gran número de ellos fueron hipotecados al Banco de Ponce, sucursal de Arecibo, y para garantizar un préstamo a los esposos Alum Serrano.

"4. En 17 de septiembre de 1952 los demandantes debían a los esposos Campos Márquez $2,837.00 por cánones de arrenda-

miento atrasados. Para cobrar éstos, más $5,000.00 por daños supuestamente causados a los locales, los ahora demandados radicaron ante la Sala de Arecibo de este Tribunal el pleito CD 52-901, de Campos del Toro et al., v. Delio Alum et al., sobre Cobro de Dinero y Daños y Perjuicios, solicitaron aseguramiento de sentencia que les fue concedido; prestaron la fianza que les fijó el Tribunal, y fue aprobada; se expidió orden de embargo y los demandantes en aquella acción señalaron al alguacil 'como bienes de los demandados a embargar los siguientes: todo el equipo del hotel, que incluye los muebles, vitrinas, mercancías, escaparates, neveras, mostradores, cocinas y útiles de los mismos, y la barra y lámparas, alfombras y dinero en caja.'

"5. El alguacil, a petición y bajo la dirección de Campos del Toro, a virtud de la orden expedida en el pleito para el cobro de los alquileres, procedió a embargar, y embargó, el hotel y, además el salón de belleza y la vivienda; lanzó a la calle a Alum y sus huéspedes; cerró los locales; no permitió que la Sra. Serrano de Alum penetrara en ellos, y entregó la llave a don Gumersindo Román.

"6. No existe en los autos del pleito civil CD 52-901 orden alguna del Tribunal designando a, o ratificando la designación de don Gumersindo Román como depositario de los bienes embargados.

"7. El alguacil levantó un inventario de la mayor parte de los muebles, equipo y enseres que ocupó y embargó, pero él no inventarió todos los bienes de los demandantes que sometió a embargo y entregó a Campos. Los muebles que el alguacil inventarió son los que están descritos y se especifican en el Exhibit 23 Demandados.

"8. En los locales, en el momento del embargo, estaban y fueron embargados al igual que los otros, y no aparecen en el inventario, los siguientes muebles:

"2 alfombras felpa
1 anuncio Neón 'Toñita's Beauty Parlor'
1 anuncio Neón 'Hotel Alum'
1 barra de bloques de cristal y cerámica
2 sillas 'All Purpose' del beauty parlor
4 lavabos
1 cardex de doce gavetas
38 botiquines con puertas de espejos

34 lámparas sobre botiquines
2 espejos 3 x 3 en la barra
1 balcón de balaustres torneados de caoba
3 lámparas fluorescentes 4 x 40
12 lámparas fluorescentes 4 x 20
29 lámparas fluorescentes (chrome) 4 x 20
5 lámparas fluorescentes (chrome)
1 tarima para orquesta construida de madera y cerámica
5 almohadas con sus fundas
12 mosquiteros
12 colchas
38 sábanas
31 frisas
62 toallas
24 manteles de comedor

"Es indudable que estos muebles no inventariados estaban en los locales y fueron embargados. El alguacil Marengo declaró que él no inventarió las lámparas y los botiquines porque estaban pegados a los plafones y las paredes. Lámparas, barra y alfombras, estaban incluidas en el Señalamiento de Bienes—Exhibit 1(e)—y en el Diligenciado de la Orden de Embargo—Exhibit 1(f)—se dice que fueron embargados; en el Edicto para la Subasta—Exhibit 1(o)—se anuncian '43 lámparas fluorescentes de 4 tubos y distintos tamaños' y '1 anuncio fluorescente denominado 'Toñita's Beauty Parlor' y en su contestación los demandados admiten expresamente 'el hecho tercero de la Primera Causa de Acción de la demanda enmendada', cuyos incisos (a) y (b) especifican, como enseres y mobiliario del hotel, del salón de belleza y de la vivienda de los demandantes, todas sus instalaciones eléctricas y botiquines. Mientras declaraba el testigo de los demandados don Ismael Hernández, se ofreció y admitió en evidencia una lista—Exhibit 3 Demandados—donde aparecen como bienes que estaban en el hotel cuando él lo visitara 'un anuncio Neón TS, 34 lámparas sobre botiquines, 2 espejos en barra, 3 lámparas fluorescentes, 12 lámparas, 29 lámparas chrome, 5 lámparas fluorescentes, 2 sillas Beauty Parlor, 19 manteles comedor.

"Los documentos indicados, las admisiones de los demandados y prueba aportada por ellos, demuestran que en efecto en los locales había y fueron embargados, bienes que no aparecen en el inventario. Y concluimos que los no inventariados que reclaman

los demandantes estaban allí. Además, está aceptado que se embargaron 31 camas. El alguacil declaró que sólo inventarió las ropas que estaban sobre éstas porque él no buscó en los *closets*. La demandante declaró que para cada una de ellas tenía una colcha, una frazada, un mosquitero, dos sábanas y dos almohadas con sus fundas; que nunca tuvo menos de dos toallas para cada habitación y dos manteles para cada una de las mesas de comedor. De éstas aparecen doce en inventario. La testigo doña Candita Rexach corrobora estos extremos de la declaración de la demandante y el testigo Alvarez declaró que él verificó la existencia de la ropa blanca no inventariada, del anuncio 'Hotel Alum', la barra, los lavabos, el cardex, la balaustrada, la tarima y las alfombras.

"9. Los demandantes, en septiembre 17 de 1952 aún debían (1) $2,788.92 al Banco de Ponce, (2) $536.19 a don Ismael Hernández, balance del precio de compra de algunos de los muebles, (3) $386.00 a Philco Puerto Rico, Inc.

"10. Estos créditos gozaban de preferencia y después de embargar los muebles, el equipo y los enseres que garantizaban su pago, los demandados los compraron: el del Banco de Ponce en octubre 20 de 1952, por $2,370.59, el de don Isamel Hernández en 29 de octubre del mismo año por $500.00, y el de Philco Puerto Rico, Inc. en 2 de abril de 1953, por $200.00.

"11. Estos créditos, desde las fechas en que los demandados los adquirieron hasta el día 15 de abril de este año, han devengado interés a razón del 6% anual, como especificamos a continuación:

"Banco de Ponce     5 años—5 meses—25 días   $918.145
"Ismael Hernández   5 años—5 meses—16 días    175.685
"Philco P.R., Inc.  5 años—0 meses—13 días    116.35

"12. Los bienes comprados por los demandantes a North Electric Co., mediante contrato de venta condicional, eran de los demandantes a la fecha en que se trabó el embargo. Nunca fueron cedidos por la vendedora condicional a los demandados ni a ninguna otra persona; North Electric Co., en primero de diciembre de 1952, solamente le cedió a don César Garcés y éste a Mr. James Payne y éste, posteriormente, a los demandados, el derecho a reposeer los bienes por incumplimiento del contrato de venta. Ninguno de ellos los ha reposeído.

"13. Los muebles que fueron embargados, o sea, los comprendidos en las conclusiones 7 y 8 que anteceden, fueron comprados entre el año 1948 y 1952. Por la prueba aportada llegamos a la conclusión que su valor razonable para la fecha del embargo era $16,000.00.

"14. El Hon. Ramón A. Cancio, Juez Superior, actuando en la Sala de Arecibo, en 23 octubre de 1953, declaró nulo el embargo a virtud del cual los demandados se apoderaron de los muebles en septiembre 17, 1952, y nula la subasta mediante la cual, en 13 de enero de 1953, ellos aparecen adjudicándoselos. Esta resolución fue notificada a los demandados y no apelaron, luego es firme.

"15. Para diciembre 30 de 1952, antes del día de la subasta, ya los demandados habían vendido la vellonera Seeborg que había sido embargada, y le habían arrendado los locales con todos los muebles de los demandantes a Mr. James Payne. Por tanto, independientemente da la declaración de nulidad, concluimos, como cuestión de hecho, que la subasta celebrada en 13 de enero de 1953 fue, por lo menos en parte, más aparente que real.

"16. Los demandantes no han pagado aún la sentencia por $2,837.00, dictada en 14 de noviembre de 1952, en el pleito para el cobro de los cánones; esta suma hasta el 15 de abril de 1958, a razón del 6% anual ha devengado un interés diario de $0.4728, que por 5 años 5 meses y 1 día, monta a $922.59. La sentencia dictada condenando a los demandantes a pagar la suma de $3,000.00 por daños y perjuicios ha sido apelada; este Tribunal desconoce si el recurso ha sido resuelto. Hasta el 15 de abril de este año, o sea, 5 años 5 meses 1 día, sus intereses al 6% anual, $0.50 diarios, hacen $975.50.

"17. Para asegurar estas sumas que con intereses al 15 de abril de este año ascienden a $7,735.09, los demandados embargaron bienes por valor de $16,000.00.

"18. Los demandados se defendieron de la solicitud para la nulidad de la subasta; fueron notificados oportunamente de haberse resuelto ésta adversamente a ellos; no la apelaron y, sin embargo, no devolvieron los muebles a los demandantes y en 1 de marzo de 1954, sabiendo que esos muebles no eran de ellos, los vendieron a don César Garcés.

"19. Ellos no tienen los muebles que se apropiaron.

*"Segunda Causa de Acción:*

"1. En septiembre 17 de 1952 don Delio Alum residía en la vivienda que los demandados le habían arrendado y estaba operando el hotel. Su esposa no vivía allí, tenía residencia aparte en Río Piedras y no fue lanzada. El alguacil lanzó a don Delio Alum de su vivienda por instrucciones de los demandados.

"2. Cuando el demandante Alum fue desahuciado de su vivienda, ningún tribunal había dictado sentencia u orden alguna decretando su lanzamiento. Tampoco existía acción alguna de desahucio contra él. Los demandantes nunca han convenido que cualquier sentencia que se dictara contra ellos, en un pleito para el cobro de cánones adeudados, sirviera de orden para desahuciarlos. El convenio que ellos firmaron en 29 de enero de 1949 no tiene relación alguna con, ni se refiere a, el pleito de cobro de cánones.

"3. Como consecuencia de ese lanzamiento el demandante Alum ha sufrido física y moralmente y fue privado de las conveniencias del hogar. Estos daños y perjuicios los tasamos en mil dólares ($1,000.00).

"Es cierto que la parte demandante debe realizar esfuerzos razonables para reducir los daños sufridos, pero los demandantes no tenían otros ingresos que los del negocio del hotel, y al embargarlos, quedaron prácticamente sin medios para su defensa. Dentro de las circunstancias que surgen de toda la prueba, no creemos que debemos privar a los demandantes de sus derechos por no haber demostrado toda la diligencia posible.

"La falta de diligencia de los demandantes tendría alguna importancia si ellos hubieran insistido en su Tercera Causa de Acción, más no debe militar en contra de sus derechos a cobrar el valor de los muebles, ni debe influir en contra de la acción del demandante Alum para cobrar los daños que le fueron causados por el lanzamiento ilegal, él, después de ser lanzado de su vivienda, no podía hacer nada para limitar los efectos del vejamen y las molestias que le produjeron y no podía evitar la pérdida de las conveniencias del hogar de donde ilegalmente lo echaron."

En sus conclusiones de derecho resolvió, contra los demandados, la cuestión legal planteada por ellos al efecto de que en nuestra jurisdicción no procedía la acción de daños y perjuicios por embargo ilegal cuando el pleito en que se decretó se había fallado en favor del embargante. Formuló

también separadamente, conclusiones de derecho sobre las dos causas de acción. Hizo una liquidación de las recíprocas reclamaciones de las partes, declarándolas compensadas hasta cierto límite. Dictó sentencia condenando a los esposos demandados al pago total de $9.703.31 y $1,200.00 de honorarios de abogados.

En su alegato los demandados-recurrentes sostienen que el tribunal sentenciador incidió en los siguientes errores:

"Señalamiento de Errores.

"*Primer Error:* El Tribunal Superior, Sala de San Juan, cometió error al declarar sin lugar la moción de desestimación de la demanda por falta de causa de acción.

"*Segundo Error:* El Tribunal Superior, Sala de Arecibo, cometió error al permitir prueba de y considerar hechos relativos al embargo y venta judicial efectuados en el litigio sobre cobro de cánones de arrendamiento y daños causados a la propiedad arrendada, que no fueran los que sirvieron de base para la declaración de nulidad en dicho caso.

"*Tercer Error:* El Tribunal Superior, Sala de San Juan, cometió error al conceder como remedio la devolución de los muebles embargados y subastados a virtud de aseguramiento y ejecución de sentencia, respectivamente, en el caso sobre cobro de cánones de arrendamiento y daños causados a la propiedad arrendada, y en su defecto, el valor de los muebles en el mercado cuando se embargaron.

"*Cuarto Error:* El Tribunal Superior, Sala de San Juan, cometió error al considerar y resolver que los demandantes fueron desahuciados y lanzados del local arrendado y al conceder daños y perjuicios por tal supuesto desahucio o lanzamiento.

"*Quinto Error:* El Tribunal Superior, Sala de San Juan, cometió error al no reconocer y considerar la obligación legal de los demandados de evitar o aminorar los daños mediante los recursos que en ley tenían disponibles para ello.

"*Sexto Error:* El Tribunal Superior, Sala de San Juan, cometió manifiesto error en la apreciación de la prueba.

"*Séptimo Error:* El Tribunal Superior, Sala de San Juan, cometió error al dictar sentencia declarando con lugar la demanda, por razón de ser sentencia contraria a derechos."

A nuestro juicio, el tribunal de instancia resolvió con acierto el litigio y, desde luego, no incurrió en los errores señalados. Veamos.

## I

Arguyen los demandados-recurrentes, en primer término, que erró al declarar sin lugar la moción de desestimación. Alegan que "tanto en Puerto Rico como en el continente americano, en todas las jurisdicciones, . . . una causa por daños y perjuicios como consecuencia de un embargo ilegal sólo procede cuando en el litigio en que se efectuó el embargo el demandado ha obtenido una sentencia a su favor en cuanto a la reclamación del demandante; . . ."

Sobre este punto el tribunal de instancia opinó lo siguiente:

"Los alegatos escritos de los demandados levantan dos cuestiones de derecho, y una defensa especial.

"1. Por la primera sostienen que en nuestra jurisdicción no procede la acción de daños y perjuicios por embargo ilegal cuando el pleito en que se decretó éste se ha fallado en favor del embargante. Citan a *B. Sorrentini & Cía* v. *Méndez.* 76 D.P.R. 690.

"Las circunstancias concurrentes en el caso citado y en el que nos ocupa no son iguales. Si bien en ambos la demanda a virtud de la cual se concedió el aseguramiento se declaró con lugar, en el de Sorrentini, el demandado, al contestar, contrademandó en cobro de los daños resultantes del embargo de sus bienes, que alegó fue trabado ilegalmente, porque la demanda no procedía, pero no cuestionó la validez del embargo, per se, excepto en cuanto éste surgió de un pleito injusto o sin causa. No decimos que un embargo nulo, por sí solo e independientemente del resultado del pleito principal, siempre genera una acción de daños y perjuicios. Pero es que esta causa de acción no tiene el mismo origen que la resuelta en aquel caso. Originalmente la de éste se encaminaba a recobrar la posesión (reivindicar) de bienes muebles propiedad de los demandantes—32 L.P.R.A. secs. 1111 y 1461—de los cuales los demandados se apoderaron mediante embargo y subasta nulos, cuya nulidad ha sido declarada judicialmente y aceptada por los demandados. En su estado actual

esta causa de acción no es una reivindicatoria, pero tampoco es la de daños y perjuicios. En vez de solicitar la devolución de los bienes con el valor de su uso se pide que se pague el valor de aquéllos, con el interés legal, desde la fecha en que se los apropiaron, porque en su contestación los demandados negaron tenerlos y en el juicio se presentó prueba tendiente a demostrar que ellos han vendido algunos, otros han desaparecido y otros se han deteriorado considerablemente.

"En esta situación funciona necesariamente el Artículo 230(1) del Código de Enjuiciamiento Civil en relación con las secciones 3025, 3081 y 3084(3), Título 31, Leyes de Puerto Rico Anotadas."

■ Procedió correctamente el juzgador cuando se negó a aplicar al caso la doctrina de *Martí* v. *Hernández*, 57 D.P.R. 819 (1940), *Sosa* v. *Sucn. Morales*, 58 D.P.R. 360 (1941) y *Sorrentini y Cía.* v. *Méndez*, 76 D.P.R. 690 (1954). A la luz de los hechos y circunstancias concurrentes no era necesario que los esposos Alum-Serrano hubiesen obtenido un fallo favorable en el pleito original que contra ellos inició el farmacéutico Campos del Toro. Por haber obtenido sentencia contra ellos en esa acción original no quedó inmunizado de responsabilidad por las consecuencias de las actuaciones ilegales, dañosas, dolosas y abusivas que en contra de ellos realizó, con plena conciencia, valiéndose de los trámites de un procedimiento judicial.

Su primera actuación, a través de sus empleados Lilí Porrata y Gumersindo Román, a quienes designó para que instruyeran al alguacil y lo ayudaran en la práctica del embargo durante los días 17 y 18 de setiembre de 1952, a pesar

---

(1) El texto de este artículo en lo pertinente, es como sigue:

"En un pleito para recobrar la posesión de propiedad personal, podrá dictarse sentencia a favor del demandante concediéndole la posesión de los bienes, o el valor de los mismos, si aquéllos no pudiesen ser entregados, y una indemnización de perjuicios por la retención. Si los bienes hubieren sido entregados al demandante, y el demandado reclamare su devolución, podrá dictarse sentencia a favor de éste, ordenando la devolución de dichos bienes o entrega de su valor e indemnización de daños y perjuicios por su ocupación y retención, en caso de no poderse efectuar la devolución."

de que el funcionario actuaba bajo la autoridad de un mandamiento para embargar "toda la propiedad . . . suficiente a cubrir la suma de $7,834 . . . que se reclaman en la demanda . . .", fue desalojar a los esposos allí demandados del apartamiento del edificio donde residían y del hotel, restaurante, salón de belleza, terraza de bailes y de los demás sitios del edificio donde ellos mantenían negocios; lanzar del negocio de hotel a sus huéspedes y empleados, impidiéndoles el regreso al mismo, y, embargarles bienes cuyo valor razonable lo estimó el juez a quo en $16,000.00. Según escritura pública el arriendo se convino por cinco años y vencía al 1ro. de diciembre de 1953 (Exhibit 10, demandante).

Su segunda actuación: dar y entregar en arriendo, sin permiso del tribunal ni el consentimiento de los entonces arrendatarios y demandados esposos Alum-Serrano—véanse los Exhibits 10 y 11, demandantes, y Exhibit 5, demandados— a mediados de diciembre de 1952, todos los locales del edificio de los cuales ellos habían sido lanzados en la forma expresada y, además, todos los bienes muebles y efectos embargados.

Su tercera actuación: haber vendido una vellonera Seeborg, que había sido embargada, sin orden del tribunal ni permiso de los demandados, en diciembre 30 de 1952.

Su cuarta actuación: hacer que el 13 de enero de 1953 se celebrara una subasta en ejecución de sentencia de los bienes de los demandados sin ser firme ni ejecutable esa sentencia dictada en rebeldía, y cuando ya había arrendado los bienes embargados, y adjudicarse para sí en esa subasta por $1,000.00 bienes que valían $16,000.00.

Su quinta actuación: ni él, ni el depositario de los bienes muebles embargados en setiembre de 1952, entregaron en todo o en parte los referidos bienes, no obstante la Resolución de 23 de octubre de 1953 anulando el embargo y la subasta. Sobre ello determinó el tribunal a quo: ". . . en el juicio se presentó prueba tendiente a demostrar que ellos [Campos del Toro y su esposa] han vendido algunos, otros han desaparecido y otros

se han deteriorado considerablemente." Cuando el segundo pleito finalmente se falló, en abril de 1958, no existían los bienes ni en poder del depositario judicial ni en poder de Campos del Toro.

Su sexta actuación: vender, por el precio de $10,000.00 a César Garcés, por documento redactado por un notario, el 1ro. de marzo de 1954—cinco meses después de anularse la subasta—todos los bienes embargados en setiembre de 1952 y, como dijo el tribunal recurrido". . . sabiendo que esos muebles no eran de ellos." (²)

---

(²) Entre Campos del Toro y Alum existió una "controversia . . . relacionada con el canon de arrendamiento por las premisas que ocupan en el Edificio Campos . . . ." De $1,500.00 fijado al comienzo del arriendo, se rebajó a $750.00 en enero de 1949, mientras se decidiera el canon justo por el Administrador de Inquilinato—Exhibit 1, demandante.

Campos del Toro, en su declaración como testigo de los demandantes, en parte, declaró:

"P. ¿Cuándo penetró Ud. en el hotel después del embargo?

"R. Un tiempo después yo le pedí permiso al juez para preparar el edificio y demás y él me dio el permiso.

"P. El mobiliario que fue embargado allí, ¿dónde está?

"R. Está allí.

"P. ¿Quién lo tiene?

"R. Lo tiene César Garcés.

"P. ¿Cómo lo tiene él? ¿En calidad de qué?

"R. En calidad de nada. Yo lo he dejado allí sin cobrar un centavo.

"P. ¿Usted no le vendió el mobiliario a él?

"R. Sí, señor, yo traté de vendérselo pero él no ha pagado nada.

"P. ¿La pregunta es si le vendió el mobiliario a él o no?

"R. No se lo he vendido porque no me ha pagado. Yo se lo ofrecí en venta a él.

"P. ¿Otorgó Ud. una escritura o contrato ante el licenciado Esteban Susoni vendiéndole el mobiliario a él?

"R. Ese contrato lo hizo el Lcdo. Susoni para vendérselo pero él no ha pagado los muebles.

"Sr. Juez:

"P. ¿Pero se firmó el contrato?

"R. Sí, señor.

"P. ¿De venta de los muebles?

"Sí, señor, se firmó.

"P. ¿Y no ha habido después rescisión ni disolución después del contrato?

"R. El contrato no fue inscrito nunca; fue una escritura y se hizo en el bufete del Lcdo. Susoni. Sí está prácticamente anulado porque la otra parte no ha pagado.

Tenía Campos del Toro un claro derecho a reclamar por la vía judicial ordinaria el pago de los cánones de arrendamiento vencidos y no satisfechos y los daños ilegalmente causados a su propiedad y a valerse en la acción de las medidas legales auxiliares para asegurar la efectividad de la sentencia que en su día pudiera recaer. Pero, a lo que no tenía el más remoto derecho era a la realización de las actuaciones específicas que hemos enumerado.

No se trata aquí de los casos corrientes en que se desestima una demanda habiéndose previamente embargado bienes del demandado y causado con ello perjuicios a éste, o en que se exija a fiadores responsabilidad a base de la fianza

---

"P. Ud. le notificó a Garcés que queda sin efecto el contrato por incumplimiento de él?

"R. Sí, señor.

"P. ¿Por escrito?

"R. No, señor, personalmente.

"Demandante:

"P. ¿Por cuánto le vendió Ud. Los muebles a Garcés?

"R. Por $10,000.00, todo lo que había allí.

"P. ¿A quién le entregó Ud. esos muebles antes de entregárselos a Garcés si a alguna otra persona se habían entregado?

"R. Esos muebles los tenía arrendados el Sr. Payne.

"P. ¿Cuándo se hizo el contrato de arrendamiento a Payne?

"R. Fue un contrato de arrendamiento verbal. Nunca se llevó a efecto.

"P. ¿Cuándo le arrendó Ud. ese mobiliario a Payne?

"R. Allá para enero del 1953 o 54; para enero del 1953 o 1954 . . . 53 . . .

"P. ¿Qué día de enero?

"R. Para fines de enero.

"P. ¿Ud. recuerda la fecha en que el Sr. Payne inauguró el Hotel Kin Jim?

"R. No recuerdo.

"P. ¿Ud. sabe si el Hotel Kin Jim era el Hotel Alum antes?

"R. Ese mismo era.

"P. ¿Cuando Ud. le arrendó el mobiliario a Payne, Ud. en ningún momento sacó un solo mueble de los que eran de Alum?

"R. Ninguno."

En ese documento de compraventa suscrito por Campos del Toro y su esposa, éstos expusieron que eran "dueños de los bienes muebles que se describen a continuación:" y describieron los bienes embargados a Alum, en primer lugar el "Rótulo Neón Hotel."—Exhibit 21, demandante.

En 29 de enero de 1960, en el recurso Núm. 12523 dictamos sentencia confirmando la que se había dictado en rebeldía el 14 de noviembre de 1952.

prestada por ellos para autorizar el embargo. Es de algo más grave y serio en derecho. Se trata de la privación de derechos personales y patrimoniales sin el debido proceso de ley. Los desahucios indirectos, la destrucción de varios negocios y la apropiación y venta privada a un tercero de todos los bienes muebles de los allí demandados, fueron actuaciones ilegales realizadas durante la vigencia del procedimiento. Realmente el trámite del embargo sirvió de excusa para lanzar a los allí demandados de su vivienda y hotel, privarles del arriendo y para dárselos a James L. Payne, haciéndose justicia el allí demandante por sus propias manos.

■ El embargo es una interdicción jurídica en el patrimonio del deudor, decretada a petición ex parte del acreedor reclamante. Uno de sus efectos procesales es el de sujetar o adscribir los bienes embargados al cumplimiento de la obligación o reclamación en el proceso principal, es decir, asegurar la efectividad de la sentencia que haya de dictarse en el caso de prosperar la acción ejercitada. Como medida cautelar o asegurativa su vida o eficacia depende de la acción entablada.

La Ley para asegurar la efectividad de sentencias de 1902, en vigor al solicitarse y practicarse el embargo aquí envuelto, en su Art. 10 disponía que el embargo de bienes muebles se practicaría "depositando los bienes de que se trate en poder del tribunal o de la persona designada por éste, *bajo la responsabilidad del demandante.*" Lo mismo dispone la actual Regla 56.4 de las de Procedimiento Civil. (³)

■ En la Regla 56.1 se incorporaron los principios generales que debían regir al tribunal en la consideración del proceso de aseguramiento, conforme a la norma fijada en *The National City Bank* v. *De la Torre*, 45 D.P.R. 626 (1933); *Carlo* v. *Corte*, 58 D.P.R. 889 (1941) *Paz* v. *Bonet*,

---

(³) Véanse las obligaciones del depositario de bienes objeto de depósito judicial o secuestro que se imponen por los Arts. 1687 y 1688 del Código Civil.

31 D.P.R. 68 (1922) : "Se debe garantizar al reclamante pero no oprimir al demandado o causarle innecesarias dificultades en sus negocios." Hoy se concede el aseguramiento a discreción del tribunal. Éste podrá decretarlo concediendo el embargo, la sindicatura o "cualquier otra medida que estime apropiada, según las circunstancias del caso", considerando "los intereses de todas las partes."

■ Para proteger al demandado de los daños y perjuicios consecuentes al embargo, la ley de 1902 exigió al demandante que los garantizara por medio de una fianza la cual respondería "de los daños y perjuicios que se causen al demandado por consecuencia del aseguramiento."—Art. 4—La Regla 56.3 también la exige en forma "suficiente para responder por todos los daños y perjuicios que se causen al demandado."

En *Avilés* v. *Hijos de Rafael Toro, S. en C., et al.,* 27 D.P.R. 671, 678 (1919)—caso en que concedimos daños y perjuicios por un embargo sin que se hubiera dictado sentencia sobre los méritos del caso—resolvimos que al demandante en una acción en la cual se trataba un embargo, le alcanzaba y afectaba la responsabilidad que en su perjuicio establecía el Art. 4 de la indicada ley de 1902, al igual que a los fiadores que suscribían la fianza.

El contrato de fianza suscrito por Campos del Toro, como principal obligado, no condicionó su obligación o responsabilidad a la no obtención de fallo a su favor. En lo pertinente dice:

"POR CUANTO, el Hon. Juez ha exigido para decretar el embargo solicitado, la prestación de fianza por la suma de Diez Mil dólares ($10,000), para responder de daños y perjuicios que se causen a la parte demandada por consecuencia de dicho aseguramiento;

"POR TANTO, nosotros, los abajo firmados, a saber: (a) Rafael Campos, mayor de 21 años de edad, casado con Rosaura Marqués, de ocupación comerciante, vecino de Arecibo, Puerto Rico, actuando como principal en el presente contrato de fianza;

"... . . . . . . . .

"... . . . . . . . .

"Por la presente nos comprometemos mancomunada y solidariamente a favor de la parte demandada, y por la suma de Diez Mil dólares ($10,000), de acuerdo con las disposiciones de las secciones 1, 6 y 16 de la ley arriba citada para responder hasta donde alcance o la parte de ella que fuere necesaria, en pago de los daños y perjuicios ocasionados a la parte demandada con motivo del susodicho aseguramiento.

"En testimonio de lo cual, dicho principal y fiadores han formalizado este instrumento a los—días de septiembre de 1952. (Firmado): R. Campos, principal, (firmado) José Rodríguez Torrado, fiador, y (firmado) Manuel Torrado Adrover, fiador."

En *Berríos* v. *Int. General Electric*, 88 D.P.R. 109 (1963), entre otras cosas, dijimos:

"Es bueno consignar que la acción para recobrar daños y perjuicios causados por un alegado embargo ilegal es una *ex delicto* basada en el Art. 1802 del Código Civil (31 L.P.R.A. sec. 5141). *Méndez* v. *E. Solé & Co.*, 62 D.P.R. 835 (1944); *R. Muñiz de León & Co.* v. *Melón Hnos. & Cía.*, 56 D.P.R. 330 (1940). Dicho artículo dispone en lo pertinente: 'El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.' Es la consagración de la responsabilidad aquiliana. Sobre este principio, dijimos en *Hernández* v. *Fournier*, 80 D.P.R. 93 (1957):

'Según el citado artículo [el 1802 del Código Civil] que establece uno de los principios más fundamentales de nuestro orden jurídico—el de la responsabilidad aquiliana por hechos propios—todo perjuicio, material o moral, da lugar a reparación si concurren tres requisitos o elementos: *primero,* se establece la realidad del daño sufrido; *segundo,* existe un nexo causal entre el daño y la acción u omisión de otra persona; y *tercero,* dicho acto u omisión es culposo o negligente. 4 Castán, *Derecho Civil Español* (8va. ed. 1956) 814 y sigtes.; Puig Peña, *Tratado de Derecho Civil Español,* tomo IV, vol. 2 (1951) 537 y sigtes.; 2 Díaz Pairó, *Teoría General de las Obligaciones* (3a. ed., 1954) 51 y sigtes.; Borrell, *Responsabilidades Derivadas de Culpa Extracontractual Civil* (1942) 60–76, 157–177. Ese precepto "... no admite limita-

ción ni excepción de clase alguna; y por consiguiente el causante de un daño debido a culpa o negligencia, sean las que sean sus consecuencias, está obligado a repararlo, a que al perjudicado le desaparezcan los efectos del daño sufrido." Borrell, op. cit. 169. Así, la forma de realizar el daño es indiferente. Y por el mismo fundamento en nuestra jurisprudencia son resarcibles tanto los daños materiales como los daños puramente morales. (Citas.)'

"Somos de opinión que los hechos de este caso, independientemente de si se perfeccionó o no el embargo, dan lugar a la imposición de responsabilidad bajo la letra del Art. 1802. Estamos ante una situación en que ha habido actos injustificados de parte de la recurrente mediando descuido o negligencia, y además, se han probado daños."

■ Aun cuando pudiera ordenarse el cierre de un hotel o de un apartamiento de vivienda como medida para proteger la efectividad de un embargo, el argumento que hacen los recurrentes pierde todo poder de persuasión o de justificación, cuando como en este caso, el propio demandante abre al público el hotel y todos los pisos del edificio poco después de practicado el embargo y los entrega en arrendamiento al señor Payne y con todos los bienes muebles embargados a los esposos allí demandados, no obstante faltar más de un año para el vencimiento del plazo del previo arriendo a favor de ellos.

No debe existir duda alguna de que el ahora recurrente, después de comenzada en forma legal su reclamación y de solicitar y obtener, en igual forma, que se decretara el embargo de bienes suficientes para cubrir las sumas reclamadas, abusó del procedimiento judicial y lo pervirtió para obtener resultados no autorizados, entre ellos, el de privar totalmente a sus deudores de los medios de fortuna para satisfacer su reclamación.

■ Considerando globalmente la evidencia presentada y los hechos que dio por probados el tribunal de instancia y que el recurso de revisión se da contra el fallo final y no contra

sus fundamentos, resultan frívolos los señalamientos segundo y tercero.

■ Suficientes elementos de juicio tuvo ante sí el tribunal de instancia para concluir, como concluyó, que el alguacil, a petición y bajo la dirección de Campos del Toro . . . "lanzó a la calle a Alum y sus huéspedes; cerró los locales, no permitió que la señora Serrano de Alum penetrara en ellos y entregó la llave a don Gumersindo Román." Tan efectivamente lo lanzó de allí que poco después el señor Payne tomó posesión de los pisos arrendados y de todos los bienes embargados y operó el hotel bajo un nuevo nombre. Véanse la declaración de Oscar Marengo Sotomayor, alguacil que practicó el embargo, especialmente las páginas 106 a 108 y la del Sr. Alum, páginas 219 y 220.

■ Consideramos suficiente refutación del quinto sobre el deber de aminorar los daños, lo expuesto por el juez sentenciador en los siguientes párrafos:

"Es cierto que la parte demandante debe realizar esfuerzos razonables para reducir los daños sufridos, pero los demandantes no tenían otros ingresos que los del negocio del hotel, y, al embargarlos, quedaron prácticamente sin medios para su defensa. Dentro de las circunstancias que surgen de toda la prueba, no creemos que debemos privar a los demandantes de sus derechos por no haber demostrado toda la diligencia posible.

"La falta de diligencia de los demandantes tendría alguna importancia si ellos hubieran insistido en su Tercera Causa de Acción, más no debe militar en contra de sus derechos a cobrar el valor de los muebles, ni debe influir en contra de la acción del demandante Alum para cobrar los daños que le fueron causados por el lanzamiento ilegal; él, después de ser lanzado de su vivienda, no podía hacer nada para limitar los efectos del vejamen y las molestias que le produjeron y no podía evitar la pérdida de las conveniencias del hogar de donde ilegalmente lo echaron."

El sexto error que se refiere a la apreciación de la prueba es evidentemente frívolo. El séptimo, que se somete "por la argumentación de los demás errores", también lo es.

*Se confirmará en todas sus partes la sentencia recurrida.*